CONAGRA, INC., DOING BUSINESS AS PEAVEY COMPANY, APPELLEE, V. BARTLETT PARTNERSHIP, APPELLANT.

540 N.W.2d 333

Filed December 8, 1995.   No. S-94-175.

James J. McNally for appellant.

Jeffrey H. Jacobsen and Timothy M. Welsh, of Jacobsen, Orr, Nelson, Wright, Harder & Lindstrom, P.C., for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and GERRARD, JJ.

CAPORALE, J.

# I. INTRODUCTION

In this breach of contract action, the district court, pursuant to verdict, entered judgment in favor of the plaintiff–appellee, ConAgra, Inc., doing business as Peavey Company, and against the defendant–appellant, Bartlett Partnership. The partnership thereupon appealed to the Nebraska Court of Appeals, asserting, in summary, that the district court erred in (1) overruling the partnership's motion for a directed verdict made at the close of all the evidence, (2) instructing the jury, and (3) entering judgment on a verdict not supported by the evidence. In order to regulate the caseloads of the Court of Appeals and this court, we, on our own motion, removed the matter to this court. We now affirm the judgment of the district court.

# II. FACTS

ConAgra, through its grain trading division, Peavey, operates grain elevators in various Nebraska locations and a grain merchandising office in Kearney, Nebraska. During 1992, ConAgra bought and sold in excess of 500,000,000 bushels of corn.

The partnership conducts a farming operation and consists of Roger Race, the managing partner and an experienced farmer, and three other farmers. In the summer of 1992, the partnership had approximately 2,800 acres planted in corn near Bartlett, Nebraska. In previous years, this acreage had yielded approximately 130 bushels per acre. Based on this, Race testified that he expected the total yield for 1992 to be approximately 360,000 bushels.

The land farmed by the partnership was in the Sandhills and consisted of marginal soil. Because of the soil, more water, fertilizer, and care than normal were required to secure a good crop. In 1992, the partnership undertook an extensive manure–spreading operation to improve the soil. To keep costs down, the partnership started a practice of hauling corn to ConAgra's elevator in Grand Island and then on the way back hauling manure from Hastings to the land the partnership farmed. Race testified that this unusual arrangement prompted the partnership's interest in selling its corn to ConAgra, a fact known to ConAgra.

On or about June 10, 1992, the partnership entered into a series of four contracts for the sale by the partnership and purchase by ConAgra of 300,000 bushels of corn. The first contract called for the delivery of 100,000 bushels of corn sometime in December 1992; the second for the delivery of 70,000 bushels of corn in January 1993; the third for the delivery of 65,000 bushels of corn in February 1993; and the fourth for the delivery of 65,000 bushels of corn in March 1993.

Each contract left the price to be determined by the partnership at 20 cents below the daily price of corn on the Chicago Board of Trade. The partnership had the right, up until the time of delivery, to pick the day on which the corn would be priced.

On August 13, 1992, the partnership's crop was severely damaged by a hailstorm. Race called ConAgra on August 17 or 18 to report the hail damage and talked with the plant manager in Grand Island, stating:

> "I'm calling to notify you of a very severe hail." . . . "We have got a lot of fields that are 90 to 100 percent gone."
>
> . . . .
>
> . . . "I do not — I do not know my exact salvage value," but . . . "We will be appraising the situation; as soon as we know where they are, I will call you and we will price the salvage value."

Race reported that the plant manager was sympathetic and told him, " 'Do not worry about it; we'll work something out.' "

About a month later, on September 23, 1992, Race called the plant manager and informed him that the salvage value would be close to 70,000 bushels, but to be on the safe side, he would like to lock in, or price out, 60,000 bushels. Race testified that at this time, he did not understand that there may have been some damages to pay if the partnership could not fulfill its contracts.

Later, on November 10, 1992, ConAgra placed a conference call to Race in an attempt to negotiate a settlement of the corn contracts. The plant manager and its grain merchandiser discussed various settlement terms with Race, but the parties were unable to reach an agreement.

After Race discussed the situation with his partners, the partnership decided that it would "try and buy a little corn, to start to fill these contracts," and the partnership eventually purchased 60,000 bushels of "wet" corn to dry in its facilities and deliver to ConAgra. Although it had priced out a total of 130,000 bushels of corn, the partnership delivered only 108,503.04 bushels, 100,000 bushels in fulfillment of the first contract and the remainder on the second contract. This left the partnership 61,496.96 bushels short of the corn it had priced out on the second contract and 130,000 bushels short of the corn it had contracted to sell in the third and fourth contracts.

On February 5, 1993, the plant manager called Race and told him that the remaining unpriced bushels would need to be priced out by February 20, 1993. The plant manager placed another call to Race on February 17 in an attempt to negotiate a settlement and scheduled a meeting for that purpose. Although the meeting took place, the parties were again unable to reach agreement.

On February 18, 1993, ConAgra bought corn on the market to cover the partnership's unfilled obligations under the contracts at a claimed total loss of $11,689.88. The verdict was for $5,803.51.

## III. ANALYSIS

### 1. DIRECTED VERDICT

In asserting the district court erred by overruling its motion for a directed verdict, the partnership urges that as the basic assumption of the contracts was that the corn to be delivered was to be grown on the partnership's land, the destruction of the crop by a hailstorm excused the partnership's performance.

### (a) Scopes of Review

We begin our analysis of this issue by recalling that in reviewing the action of a trial court, an appellate court must treat a motion for directed verdict as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. The party against whom the motion is directed is entitled to have every controverted fact resolved in his or her favor and to have the benefit of every

inference which can reasonably be deduced from the evidence. In order to sustain a motion for directed verdict, the court resolves the controversy as a matter of law and may do so only when the facts are such that reasonable minds can draw but one conclusion from the evidence. See, *Melcher v. Bank of Madison, ante* p. 793, 539 N.W.2d 837 (1995); *Hoeft v. Five Points Bank, ante* p. 772, 539 N.W.2d 637 (1995); *Wolf v. Walt,* 247 Neb. 858, 530 N.W.2d 890 (1995). However, to the extent the interpretation of statutes is involved, the questions presented are matters of law in connection with which an appellate court has the obligation to reach an independent conclusion irrespective of the decision made by the court below. See *Smith v. State, ante* p. 360, 535 N.W.2d 694 (1995).

(b) Application of Law to Facts

In urging that its performance was excused, the partnership relies on Neb. U.C.C. §§ 2–613 and 2–615 (Reissue 1992). Section 2–613 governs casualty to identified goods and provides in relevant part:

Where the contract requires for its performance goods identified when the contract is made, and the goods suffer casualty without fault of either party before the risk of loss passes to the buyer . . . then

(a) if the loss is total the contract is avoided; and

(b) if the loss is partial . . . the buyer may nevertheless demand inspection and at his option either treat the contract as avoided or accept the goods with due allowance . . . or the deficiency in quantity but without further right against the seller.

Section 2–615 governs excuse by failure of presupposed conditions and reads in relevant part:

(a) Delay in delivery or nondelivery in whole or in part by a seller . . . is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made . . . .

Comment 9 thereto illustrates an operation of § 2–615 thusly:

The case of a farmer who has contracted to sell crops to be grown on designated land may be regarded as falling either within the section on casualty to identified goods [2–613] or this section [2–615], and he or she may be excused, when there is a failure of a specific crop, either on the basis of the destruction of identified goods or because of the failure of a basic assumption of the contract.

But before we reach those provisions of Nebraska's Uniform Commercial Code, we must determine whether the partnership is correct in asserting that the contracts in question contemplated that the corn to be delivered was to be grown on the partnership's land.

In making that determination, we are bound by the longstanding principle of Nebraska contract law that a contract which is written in clear and unambiguous language is not subject to interpretation or construction; rather, the intent of the parties must be determined from the contents of the contract and the contract enforced according to its terms. *New Light Co. v. Wells Fargo Alarm Servs.*, 247 Neb. 57, 525 N.W.2d 25 (1994); *Rains v. Becton, Dickinson & Co.*, 246 Neb. 746, 523 N.W.2d 506 (1994); *Drain v. Board of Ed. of Frontier Cty.*, 244 Neb. 551, 508 N.W.2d 255 (1993); *Husen v. Husen*, 241 Neb. 10, 487 N.W.2d 269 (1992); *Elson v. Pool*, 235 Neb. 469, 455 N.W.2d 783 (1990); *Knox v. Cook*, 233 Neb. 387, 446 N.W.2d 1 (1989); *Smith v. United States Fidelity & Guaranty Co.*, 142 Neb. 321, 6 N.W.2d 81 (1942); *Farmers Ed. and Coop. Union v. Farmers Ed. and Coop. State Union*, 133 Neb. 397, 275 N.W. 464 (1937).

The three contracts at issue are identical standardized form contracts which on their face state that the partnership will deliver a given number of bushels of corn to ConAgra within specified timeframes. On the back of each contract, it was provided that the "[partnership] warrants to [ConAgra] that all grain sold and delivered hereunder will be of good, sound, dry and merchantable quality" and that "[the grain] will have been grown in the Continental United States." Except for provisions which pertain to the quality of the grain to be delivered, there were no other conditions or specifications as to the grain

included in the contracts. The contracts also contained an integration clause which provided that the "[c]ontract is intended by the parties as a final expression of their agreement and is intended also as a complete and exclusive statement of the terms and conditions of their agreement."

The contracts did not identify the corn in any way other than by kind and amount. Nor did the contracts make any reference to corn grown or to be grown by the partnership on any identified acreage. The only limitation the contracts placed on the source of the corn was that it be grown in the continental United States.

The only conclusion that can be drawn from the language of the contracts is that they contemplated that the partnership could fulfill its contractual obligations by acquiring corn from any place or source so long as the corn was of merchantable quality and had been grown within the continental United States. Thus, it cannot be said the contracts at issue are ambiguous. They therefore are not subject to interpretation or construction and must be enforced according to their terms.

The legal reality is that as the corn was fungible and not identified with particularity, neither § 2–613 nor § 2–615 is applicable to this case. See, *Bunge Corporation v. Recker*, 519 F.2d 449 (8th Cir. 1975) (where contract did not identify beans other than by kind and amount, destruction of portion of farmer's crop by weather did not constitute act of God which would excuse performance); *Ralston Purina Company v. McNabb*, 381 F. Supp. 181 (W.D. Tenn. 1974) (in absence of showing contract was to sell crop from specified land, defense of impossibility due to bad weather and flooding unavailable); *Wickliffe Farms, Inc. v. Owensboro Grain Co.*, 684 S.W.2d 17 (Ky. App. 1984) (statutory defense of impossibility not available to seller contracting for delivery of white corn despite draught which struck seller's farm, since contract merely called for delivery of 35,000 bushels of white corn without specifying where such corn was to be grown); *Colley v. Bi–State, Inc.*, 21 Wash. App. 769, 586 P.2d 908 (1978) (failure of wheat farmer to deliver grain not excused under U.C.C. §§ 2–613 or 2–615, as contract did not require farmer to grow grain himself or at particular location); *Semo Grain Co. v. Oliver Farms, Inc.*, 530

S.W.2d 256 (Mo. App. 1975) (where contract made no reference to soybeans grown by seller, seller could have fulfilled obligation to deliver soybeans to buyer by acquiring beans from any place or source).

### (c) Resolution

Accordingly, the district court did not err by overruling the partnership's motion for directed verdict.

### 2. INSTRUCTIONS TO JURY

The partnership next contends that the district court's instructions did not properly advise the jury as to the circumstances under which the law excuses performance of a contract.

In essence, the partnership's arguments in regard to the instructions merge to claim that the district court should have instructed in accordance with the contents of §§ 2–613 and 2–615, as the partnership sought. However, as we have seen, these provisions of the code have no application.

Accordingly, the district court did not err in its instructions to the jury.

### 3. SUPPORT OF VERDICT BY EVIDENCE

The partnership rests its claim that the evidence does not support the verdict on the fact that the amount of the verdict is less than the amount ConAgra asserted it was damaged.

### (a) Scope of Review

A verdict is not to be set aside on appeal unless clearly wrong, and it is sufficient if any competent evidence is presented to the jury upon which it could find for the successful party. *Melcher v. Bank of Madison, ante* p. 793, 539 N.W.2d 837 (1995); *Hoeft v. Five Points Bank, ante* p. 772, 539 N.W.2d 637 (1995); *Wolf v. Walt,* 247 Neb. 858, 530 N.W.2d 890 (1995).

### (b) Application of Law to Facts

The evidence establishes that to make up for the corn the partnership failed to deliver, ConAgra purchased corn on the open market at various prices.

The partnership's present position in this regard ignores one

of its primary contentions at trial, i.e., that ConAgra should have covered the contracts at an earlier date when its losses would have been lower. This, coupled with the fact that there was a good deal of evidence showing that corn prices varied widely between the time the partnership contracted and the time ConAgra moved to cover the partnership's breach, shows that the jury's verdict bore a reasonable relationship to the elements of the damages proved.

It is well established that in awarding damages, the fact finder is not required to accept a party's evidence of damages at face value, even though that evidence is not contradicted by evidence adduced by the party against whom the judgment is to be entered. Neither is it necessary that an appellate court be able to discern the exact computations by which a verdict is reached. *Union Ins. Co. v. Bailey*, 234 Neb. 257, 450 N.W.2d 661 (1990). The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994).

### (c) Resolution

Accordingly, it cannot be said that the evidence does not support the verdict. It therefore follows that the district court did not err in entering judgment in accordance with the verdict.

### IV. JUDGMENT

Since the record supports none of the assignments of error, the judgment of the district court must be, and hereby is, affirmed.

AFFIRMED.

CONNOLLY, J., not participating.