# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-4093

_____

Trudy Nolles; Angie Palmer; David   *
M. Jeffrey,   *
  *
    Appellants,   *
  *
    v.   *   Appeal from the United States
  *   District Court for the
The State Committee for the   *   District of Nebraska.
Reorganization of School Districts;   *
Kendall Moseley; Gil Kettelhut;   *   [PUBLISHED]
Teresa Hawk; Gerry Osborn; Terry   *
Loshen,   *
  *
    Appellees.   *

_____

Submitted: May 17, 2007
Filed:  April 28, 2008

_____

Before MURPHY, HANSEN, and COLLOTON, Circuit Judges.

_____

HANSEN, Circuit Judge.

Trudy Nolles, Angie Palmer, and David M. Jeffrey (collectively "Plaintiffs") are registered voters in Nebraska who brought this 42 U.S.C. § 1983 action challenging the State Committee for the Reorganization of School Districts' (hereinafter "State Committee") implementation of Legislative Bill 126 (LB 126),

which implementation occurred prior to the November 2006 referendum vote which ultimately repealed LB 126. The Plaintiffs claim that the State Committee's actions violated the Plaintiffs' rights to substantive and procedural due process and their right to vote as protected by the United States Constitution. We dismiss both of the due process claims for lack of standing, and we affirm the district court's[1] judgment dismissing the right to vote claim.

I.

In 2005, the Nebraska legislature, overriding the Governor's prior veto, passed LB 126, which, *inter alia,* mandated the dissolution of all Class I school districts and required the Class I school districts to be merged into larger school districts that served students through the twelfth grade. Class I school districts provided education for students only from kindergarten through the eighth grade. LB 126 required the State Committee to issue orders by December 1, 2005, directing how each Class I school district would be merged. The orders merging the school districts were required by LB 126 to take effect on June 15, 2006, following the end of the 2005-2006 school year.

Nebraska citizens commenced a referendum effort, see Neb. Const. art. III, §§ 1, 3, & 4, and obtained enough signatures to put the repeal of LB 126 on the ballot at the next general election, which was to be held on November 7, 2006. The referendum effort did not, however, garner enough signatures to suspend the operation of LB 126 pending the result of the election, as required under Nebraska Constitution Article III, Section 3 (requiring the signature of 10% of registered voters to suspend the operation of the challenged law). Three residents and taxpayers in Class I school districts, along with several school districts, filed suit in Nebraska state court (referred

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

to as the "Pony Lake litigation") seeking an injunction to prevent the State Committee from complying with LB 126 and entering consolidation orders before the November 2006 election. The state district court granted a permanent injunction, finding that the effective dates of the consolidation orders impermissibly burdened the people's right of referendum.

The State Committee appealed the injunction to the Supreme Court of Nebraska. Under Nebraska law, the appeal stayed the district court's injunction, see Neb. Rev. Stat. § 25-21,213 (1995), and the Supreme Court declined to issue its own temporary restraining order. On December 1, 2005, no longer under any injunction, the State Committee issued its orders of merger as required by LB 126, although the orders were not to take effect until June 15, 2006. The state court appellees then cross-appealed, claiming that LB 126's effective dates denied them the right to vote and the right to freedom of speech protected by the United States Constitution. The Supreme Court of Nebraska reversed the district court on March 3, 2006, concluding that the trial court had misapplied Nebraska's constitutional provisions regarding referendums and holding that Article III, Section 3 of the Nebraska Constitution clearly provided that where the referendum petition failed to garner sufficient signatures, the legislation facing the ballot was not to be suspended pending the vote. See Pony Lake Sch. Dist. 30 v. State Comm. for the Reorg. of Sch. Dists., 710 N.W.2d 609, 621-22 (Neb.), cert. denied, 547 U.S. 1130 (2006). The state Supreme Court also addressed the federal voting right and free speech right issues raised by the cross-appeal to determine if the trial court could be affirmed on either alternative basis but determined that it could not. It determined that the right to vote protected by the federal Constitution applied to the right to participate in a representative government and had no impact on the direct democracy referendum process. Id. at 623-24. It further found no free speech violation because the referendum process did not restrict the state appellees' ability to communicate with voters about their attempt to repeal LB 126. Id. at 624-25.

After the Supreme Court of the United States denied the <u>Pony Lake</u> plaintiffs' petition for certiorari on May 15, 2006, the current Plaintiffs, none of whom were parties to the state court litigation, brought a declaratory judgment action in federal district court on June 8, 2006, claiming that LB 126 violated the federal Constitution's protection of the rights to vote and to freedom of speech, and the Fourteenth Amendment's protection of the rights to substantive due process and procedural due process. They sought a declaration that the State Committee's actions were unconstitutional and therefore null and void. In the meantime, the school districts were merged pursuant to LB 126 effective June 15, 2006. The federal district court stayed its ruling on the § 1983 claims to see if the voters would retain LB 126, thus mooting the claims. The referendum appeared on the ballot at the November 7, 2006, general election, and the voters of Nebraska voted to repeal LB 126. Nothing about the repeal affected the prior actions of the State Committee or otherwise authorized the re-establishment of the dissolved school districts.

The district court subsequently dismissed the federal case, finding all of the claims to be barred by res judicata based on the <u>Pony Lake</u> litigation. The district court also determined that the right to vote and the right to freedom of speech claims were mooted because the Plaintiffs did in fact vote on the referendum and that the due process claims lacked merit. The Plaintiffs appeal.[2]

## II.

A.    Due Process

Even though not raised by the parties or addressed by the district court, we "are under an independent obligation to examine [our] own jurisdiction, and standing is

---

[2]The Plaintiffs do not address the freedom of speech claim on appeal, and neither do we.

perhaps the most important of the jurisdictional doctrines." United States v. Hays, 515 U.S. 737, 742 (1995) (internal marks omitted). Federal courts are courts of limited jurisdiction, cabined by the authority granted to them by Article III of the United States Constitution. Article III limits federal courts' jurisdiction to the deciding of "Cases" and "Controversies." U.S. Const. art III, § 2; see also Hein v. Freedom from Religion Found., Inc., 127 S. Ct. 2553, 2562 (2007) ("'"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."'" (quoting Raines v. Byrd, 521 U.S. 811, 818 (1997) (in turn quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976))). "'One of the controlling elements in the definition of a case or controversy under Article III' is standing." Hein, 127 S. Ct. at 2562 (quoting ASARCO Inc. v. Kadish, 490 U.S. 605, 613 (1989) (Kennedy, J., concurring)). At a "'constitutional minimum,'" standing requires three elements: (1) injury in fact, (2) causation, and (3) redressability. Hays, 515 U.S. at 742-43 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Injury in fact requires the party bringing suit to have "a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Id. at 743 (internal marks omitted).

### 1. Substantive Due Process

The Plaintiffs claim that the implementation of LB 126 prior to the referendum vote, as required by Article III, Section 3 of the Nebraska Constitution, rendered their vote in the referendum election ineffective, resulting in a fundamentally unfair election process in violation of their right to substantive due process. The contested standing issue with respect to the substantive due process claim is whether the Plaintiffs can establish an injury in fact. "A federal court cannot pronounce any statute, either of a State or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." Baker v. Carr, 369 U.S. 186, 204 (1962) (internal marks omitted); see

also id. at 206 (holding that only those "voters who allege facts showing disadvantage to themselves as individuals have standing to sue").  Federal courts lack the authority to review legislative acts merely because they are allegedly unconstitutional.  Rather, the courts are limited to considering the constitutionality of a legislative act only when it is said to result in or threaten a direct injury to the party challenging the act.  See Massachusetts v. Melon, 262 U.S. 447, 488 (1923) (dismissing for lack of standing a claim that the Maternity Act was unconstitutional in a case brought based on taxpayer standing).  "[W]here large numbers of Americans suffer alike, the political process, rather than the judicial process, may provide the more appropriate remedy for a widely shared grievance."  Fed. Election Comm'n v. Akins, 524 U.S. 11, 23 (1998).

"Election law, as it pertains to state and local elections, is for the most part a preserve that lies within the exclusive competence of the state courts."  Bonas v. Town of N. Smithfield, 265 F.3d 69, 74 (1st Cir. 2001).  A canvass of substantive due process cases related to voting rights reveals that voters can challenge a state election procedure in federal court only in limited circumstances, such as when the complained of conduct discriminates against a discrete group of voters, see, e.g., Hays, 515 U.S. at 744-45 (plaintiffs residing in racially gerrymandered districts could challenge redistricting as racially discriminatory); Griffin v. Burns, 570 F.2d 1065, 1074 (1st Cir. 1978) (absentee voters whose votes were not counted could challenge decision, made after election, not to count absentee votes), when election officials refuse to hold an election though required by state law, resulting in a complete disenfranchisement, see Duncan v. Poythress, 657 F.2d 691, 693 (5th Cir. 1981) (holding "that the due process clause of the fourteenth amendment . . . protects against the disenfranchisement of a state electorate in violation of state election law" where state officials refused to hold an election for a vacant Supreme Court justice seat as required by state law) (subsequent history omitted); Bonas, 265 F.3d at 74-75 (holding that town officials violated voters' due process rights by refusing to hold a local election as mandated by state and local rules), or when the willful and illegal conduct of election officials results in fraudulently obtained or fundamentally unfair voting

results, see United States v. Saylor, 322 U.S. 385, 388-89 (1944) (fraudulent ballot stuffing); Briscoe v. Kusper, 435 F.2d 1046, 1055 (7th Cir. 1970) (holding that city board of election commissioners violated voters' rights to substantive due process by changing voting rules without informing voters of new requirements for voting and then refusing to count their votes).

The Supreme Court has "'consistently held that a plaintiff raising only a generally available grievance about government–claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large–does not state an Article III case or controversy.'" Lance v. Coffman, 127 S. Ct. 1194, 1196 (2007) (quoting Lujan, 504 U.S. at 573-74). In Lance, four Colorado voters brought a claim in federal court, alleging that a provision of the Colorado Constitution permitting congressional redistricting only once per census violated their Elections Clause right to have their elected representatives set their congressional district boundaries.[3] See id. The Supreme Court held that the voters lacked standing to challenge application of the Colorado Constitution because their only injury, "that the law–specifically the Elections Clause–ha[d] not been followed," alleged only a generalized grievance. Id. at 1198. The Court found the voters' claim to be "quite

_____

[3]The facts of Lance are somewhat analogous to the facts here. In Lance, a state court redrew congressional district boundaries when the Colorado legislature was unable to agree on how to set the boundaries to accommodate an additional member of the federal House of Representatives following the 2000 census. The Colorado legislature finally reached agreement and subsequently redrew the district boundaries in 2003. The Colorado Attorney General challenged the subsequent redistricting as a violation of Article V, Section 44 of the Colorado Constitution, which limited redistricting to once per census. See Lance, 127 S. Ct. at 1196. Following extensive adjudication in state court, in which the Colorado Supreme Court ultimately struck down the 2003 legislatively-drawn redistricting plan as a violation of Section 44, the voter-plaintiffs moved to federal court, challenging the application of the state constitution as violating their rights under the federal constitution.

different from the sorts of injuries alleged by plaintiffs in voting rights cases where [it had] found standing." Id. (distinguishing Baker, 369 U.S. at 207-08, where the Court held that voters in specific counties had standing to challenge as a substantive due process violation a state apportionment statute that apportioned state representatives among counties in a racially discriminatory manner); see also Hays, 515 U.S. at 744-45 (holding that while a plaintiff residing in a racially gerrymandered district had standing to challenge the redistricting, a plaintiff not residing in such a district lacked standing to challenge the redistricting).

The Eleventh Circuit recently recognized that Lance abrogated its prior precedent and held that voters in a county lacked independent standing to challenge a consent decree that increased the number of county commissioners, required a cumulative voting system, and instituted a system whereby the rotating Commission chairmanship would periodically be offered to an African-American. See Dillard v. Chilton County Comm'n, 495 F.3d 1324 (11th Cir. 2007). Under its prior precedent, the Eleventh Circuit had found standing where voters were subject to a newly imposed election scheme ordered by the consent decree. Id. at 1331 (discussing Dillard v. Baldwin County Comm'rs (Baldwin III), 225 F.3d 1271, 1277 (11th Cir. 2000)). The court determined that Lance changed its analysis, noting that Lance differentiated between plaintiffs "who alleged concrete and personalized injuries in the form of denials of equal treatment or of vote dilution, and plaintiffs like those in the instant case, . . . who merely seek to protect an asserted interest in being free of an allegedly illegal electoral system." Dillard, 495 F.3d at 1333.

The Plaintiffs in this case are attempting to bring a generalized grievance shared in common by all the voters in Nebraska who voted to repeal LB 126. Because they have not asserted a personalized injury, they lack standing to assert a violation of substantive due process under the Fourteenth Amendment. The Plaintiffs couch their claim as one against the actions of the State Committee in voting to dissolve the Class I school districts prior to the referendum election. We respectfully reject this

-8-

characterization. First, the State Committee did not act of its own accord, exercise its own independent judgment or discretion, or "vote" in any sense of the term, but instead acted pursuant to the mandatory requirements of the Nebraska constitution and the lawful directions of the then duly-enacted LB 126, which ordered the State Committee to dissolve the school districts on or before December 1, 2005, with an effective date of June 15, 2006. (See Appellants' App. at 46, LB 126 § 2(1) ("[O]n or before December 1, 2005, the State Committee . . . shall enter an order dissolving any Class I school district that does not comply with the requirements of subsection (4) of section 1 of this act . . . .) (emphasis added); id., LB 126 § 2(4) ("The effective date . . . shall be . . . June 15, 2006, for all other purposes [besides establishing residency].").) The State Committee members did not "vote" to dissolve the school districts, but merely acted to carry out their obligatory duties as mandated by the duly enacted and then binding and effective legislation.

Second, the claim that the application of Article III, Section 3 of the Nebraska Constitution (which prevented the delaying of the implementation of LB 126 until after the referendum election) resulted in a fundamentally unfair election does not allege a personalized injury. The Plaintiffs do not allege that they were treated differently than other voters or that their votes were diluted as compared to other voters, that election officials refused to count their votes or failed to follow state election procedures, or even that the State Committee violated state law in dissolving the school districts (the Plaintiffs' complaint is the opposite–that the State Committee followed state law to the Plaintiffs' detriment). Nebraska voters successfully repealed LB 126 through the referendum voting process. As in Lance, they challenge only the application of the Nebraska Constitution to the state-created referendum process. This is a generalized grievance better left to the state political and legislative process. In short, the Plaintiffs fail to allege a specific individualized injury necessary to establish standing in federal court resulting from the allegedly unfair election, that is, an injury not shared by all the voters who voted as they did in the referendum election. (See Appellants' Suppl. Br. at 5, arguing that there had been an injury to the right of every

-9-

voter to a fundamentally fair election).  Because the Plaintiffs lack federal Article III standing, their substantive due process claim must be and is dismissed for lack of federal jurisdiction.

2.    Procedural Due Process

The Plaintiffs, all property taxpayers, also brought a procedural due process claim, alleging that the consolidation of the Class I school districts would increase property taxes for some properties located in a former Class I district, and that they were entitled to a hearing before their property taxes could be raised.  None of the Plaintiffs alleged, however, that their own property taxes were in fact (or would be) increased, only that some property taxes within the state would be raised, some would be lowered, and some would remain unchanged.  Indeed, "[a]t the time this suit was filed the tax rates for the newly reorganized districts had not yet been set." (Appellants' Suppl. Br. at 9.)  The amended complaint filed in the district court did not mention an increase in property taxes at all, but asserted only that the State Committee's actions of dissolving school districts and changing school district boundaries were quasi-judicial actions requiring a hearing. (Appellants' App. at 154, 156.)

The Plaintiffs failed to allege a particularized injury and thus lack standing to bring this procedural due process claim.  See Raines, 521 U.S. at 818-19 ("[A] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct." (internal marks omitted)).  Article III's case and controversy prerequisite "requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982) (quoting Gladstone, Realtors v. Vill. of Bellwood, 441 U.S. 91, 99 (1979)).  See also Lujan, 504 U.S. at 560 n.1 ("By particularized, we mean that the injury must affect the plaintiff in a

personal and individualized way."). The Plaintiffs' claimed injury of the potential for increased property taxes without a hearing was conjectural, not concrete and actual or imminent at the time they filed their complaint, as is required to establish the standing necessary to challenge the state action. See Lujan, 504 U.S. at 560; see also id. at 570 n.4 (plurality opinion) (Standing is "assessed under the facts existing when the complaint is filed."). The procedural due process claim is dismissed for lack of jurisdiction.

B.      Right to Vote

The Plaintiffs claim that the State Committee violated their fundamental right to vote in the referendum election by implementing LB 126 before the general election, thus nullifying their subsequent sufficient vote to repeal LB 126. The district court dismissed the right to vote claim based on res judicata, or claim preclusion, applying the equitable doctrine of virtual representation and concluding that the Nebraska Supreme Court conclusively decided this issue in the Pony Lake litigation. The application of res judicata is a legal conclusion that we review *de novo*. See St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp., 457 F.3d 766, 770 (8th Cir. 2006). "The res judicata effect of the first forum's judgment is governed by [the] first forum's law," id. (internal marks omitted), or Nebraska law in this case. Additionally, we review *de novo* the district court's interpretation and application of state law. See Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991).

Under Nebraska law,

[t]he doctrine of res judicata, or claim preclusion, bars the relitigation of
a matter that has been directly addressed or necessarily included in a
former adjudication if (1) the former judgment was rendered by a court
of competent jurisdiction, (2) the former judgment was a final judgment,
(3) the former judgment was on the merits, and (4) the same parties or
their privies were involved in both actions.

-11-

Ichtertz v. Orthopaedic Specialists of Neb., P.C., 730 N.W.2d 798, 804 (Neb. 2007). The Supreme Court of Nebraska addressed and rejected the Pony Lake plaintiffs' constitutional claims, including the same right-to-vote claim brought by the Plaintiffs here. Thus, if applicable, res judicata prevents these Plaintiffs from relitigating the same claim in a second forum. The first three elements are not in dispute. The judgment in the Pony Lake litigation was issued by a court of competent jurisdiction; that judgment is final; and the judgment determined the merits of the Pony Lake plaintiffs' right-to-vote claim under the United States Constitution. Thus, the only contested issue is whether the Plaintiffs in the present case are in privity with the Pony Lake plaintiffs.

"State courts are generally free to develop their own rules for protecting against the relitigation of common issues," as long as the state's application of its preclusion doctrines complies with due process. Richards v. Jefferson County, Ala., 517 U.S. 793, 797 (1996). Due process under the United States Constitution precludes giving "a conclusive effect to a prior judgment against one who is neither a party nor in privity with a party therein." Id. at 797 n.4 (internal marks omitted). "[A]lthough there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term." Id. at 798. Finding a party to be a virtual representative for a nonparty to the suit is another way of saying that the nonparty was in privity with the party in the original suit. See Pirrotta v. Indep. Sch. Dist. No. 347, 396 N.W.2d 20, 22 n.1 (Minn. 1986) (noting that virtual representation appears to be no different from the traditional privity analysis).

"[V]irtual representation is best understood as an equitable theory rather than as a crisp rule with sharp corners and clear factual predicates, such that a party's status as a virtual representative of a nonparty must be determined on a case-by-case basis." Gonzalez v. Banco Cent. Corp., 27 F.3d 751, 761 (1st Cir. 1994) (internal citations

omitted). As an equitable tool, courts weigh various factors in determining whether a party to a suit virtually represented a nonparty. The weight and identity of the factors vary from case to case, but a few common threads appear throughout the cases, indicating a handful of critical factors. This court has previously concluded that "identity of interests between the two parties is necessary, though not alone sufficient." Tyus v. Schoemehl, 93 F.3d 449, 455 (8th Cir. 1996), cert. denied, 520 U.S. 1166 (1997). The Supreme Court has focused on notice (actual or constructive) and sufficient representation as minimum requirements before a nonparty can be bound by a prior judgment, particularly when a nonparty seeks to adjudicate private interests. See Richards, 517 U.S. at 805; see also Gonzalez, 27 F.3d at 761 ("[N]otwithstanding identity of interests, virtual representation will not serve to bar a nonparty's claim unless the nonparty has had actual or constructive notice of the earlier litigation, and the balance of the relevant equities tips in favor of preclusion.") (internal footnotes omitted). Other factors that may support a finding of virtual representation include a close relationship, participation by the nonparty in the prior litigation, apparent acquiescence, tactical maneuvering by the nonparty to avoid the effects of the first action, and whether the issue involves public or private issues. See Tyus, 93 F.3d at 455-56; Irwin v. Mascott, 370 F.3d 924, 929-30 (9th Cir. 2004) ("In short, a close relationship, substantial participation, and tactical maneuvering all support a finding of virtual representation; identity of interests and adequate representation are necessary to such a finding.").

The Supreme Court of Nebraska has not had a specific occasion to apply the doctrine of virtual representation, so we are tasked with determining how and whether that court would apply the doctrine in this case. Applying federal claim preclusion law, the Nebraska Supreme Court has held nonparties to be in privity with parties to a prior suit, noting that "privity requires, at a minimum, a substantial identity between the issues in controversy and showing the parties in the two actions are really and substantially in interest the same." VanDeWalle v. Albion Nat'l Bank, 500 N.W.2d 566, 573 (Neb. 1993) (internal marks omitted) (holding that two brothers were

collaterally estopped from litigating the ownership of a piece of property based on a prior suit brought by their parents). The Nebraska Supreme Court has quoted this language from VandeWalle approvingly in subsequent cases applying Nebraska law. See, e.g., R.W. v. Schrein, 642 N.W.2d 505, 511 (Neb. 2002) (holding that an insurer was not in privity with its insured where it had no duty to defend the insured on the claim that was the subject of the action); Torrison v. Overman, 549 N.W.2d 124, 132 (Neb. 1996) (same). In addressing the privity prong of claim preclusion, the Supreme Court of Nebraska has stated that "due process requires that the rule . . . operate only against persons who have had their day in court either as a party to a prior suit or as a privy; *and, where not so, that at least the presently asserted interest was adequately represented in the prior trial.*" Gottsch v. Bank of Stapleton, 458 N.W.2d 443, 457 (Neb. 1990) (emphasis added) (internal marks omitted). The Supreme Court of Nebraska has recognized, moreover, that the Nebraska class action statute, which allows a class representative to represent numerous parties with common interests, is analogous to the equitable doctrine of virtual representation. See Blankenship v. Omaha Pub. Power Dist., 237 N.W.2d 86, 89-90 (Neb. 1976) (recognizing that a class representative's interests must be compatible with the interests of all class members by drawing an analogy to the doctrine of virtual representation). Given the broad application of privity allowed by the Nebraska courts and the equitable nature of the doctrine, we agree with the district court that the Nebraska courts would consider the doctrine of virtual representation in determining whether a subsequent party was in privity with a party to an earlier suit. We proceed to weigh the relevant factors.

The interest asserted here is identical to the interests asserted in the Pony Lake litigation. The Plaintiffs here claim that the Committee's actions infringed upon their constitutional right to vote on the repeal of LB 126. The Pony Lake plaintiffs made the same constitutional claim, asserting "their right to vote on the forced consolidation of the Class I school districts." Pony Lake, 710 N.W.2d at 622-23. The Plaintiffs here assert their rights as voters and members of the Class I districts, the same interests

held by the plaintiffs in the <u>Pony Lake</u> litigation.  The critical factor of similar interests required by <u>Tyus</u> is satisfied; indeed, the interests are identical.

Although the right to vote is an individual right, the claim here is not that the Plaintiffs were prevented from voting–they were not.  Rather, the Plaintiffs claim that the Committee's actions of consolidating the school districts (as mandated by LB 126) prior to the election deprived them of an effective vote.  We view this claim as public in nature.  The Committee's actions complied with Nebraska law, and it was the Nebraska Constitution that required implementation of LB 126 prior to the referendum election that resulted in the repeal of LB 126.  The Plaintiffs' voting rights claim in this lawsuit in effect challenges the constitutionality of Nebraska's state constitution based referendum scheme that provides for implementation of challenged legislation prior to the referendum vote unless ten percent of registered voters sign the referendum petition.  This is analogous to the facts of <u>Niere</u>, where nonregistered voters brought Equal Protection and First Amendment challenges to the Missouri legislative scheme that allowed the disincorporation of their town based on a petition signed by a supermajority of registered voters.  <u>See</u> <u>Niere v. St. Louis County, Mo.</u>, 305 F.3d 834, 838 (8th Cir. 2002) (concluding that constitutional claims brought by nonregistered voters seeking to challenge the disincorporation of their town were public in nature); <u>see</u> <u>also</u> <u>Tyus</u>, 93 F.3d at 457 (characterizing First Amendment challenge as raising an issue of public law where "the plaintiffs [did] not allege that they 'ha[d] a different private right not shared in common with the public'") (quoting <u>Stromberg v. Bd. of Educ. of Bratenahl</u>, 413 N.E.2d 1184, 1186 (Ohio 1980), which found a taxpayer's challenge to the dissolution of a school district to be public in nature and precluded by an earlier suit brought by the school board for the district).

The due process concerns that limit the application of the res judicata doctrine to nonparties are lessened when the rights asserted involve issues of public concern rather than private rights.  <u>See</u> <u>Richards</u>, 517 U.S. at 803 (distinguishing between public and private interests and noting that "States have wide latitude to establish

procedures . . . to limit the number of judicial proceedings that may be entertained" in cases raising public issues); Tyus, 93 F.3d at 457 (noting that "the due process concerns attendant with a broad application of preclusion are lessened" in cases raising public issues). In Tyus, the court noted that the nonparties to the first suit would have benefitted if the named parties had won, but, absent preclusion, the nonparties were not harmed by the named party's loss. Thus, there was no incentive to intervene in the original action, and the lack of preclusion actually promoted fence sitting. Tyus, 93 F.3d at 457 ("[H]olding preclusion inapplicable assures that a party would not intervene, for it would allow various members of a coordinated group to bring separate lawsuits in the hope that one member of the group would eventually be successful, benefitting the entire group."). The same is true here. When the Pony Lake plaintiffs were unsuccessful, a new group of voters and taxpayers brought this suit, raising the same claims. If preclusion is not proper here and the Plaintiffs in this case are not successful, nothing will prevent the next group of voters who voted to repeal LB 126 from filing another suit. "This entails a significant cost to the judicial system and discourages the principles and policies the doctrine of *res judicata* was designed to promote." Id.

Although none of the Plaintiffs in this case were named plaintiffs in the Pony Lake litigation, one of these Plaintiffs is the spouse of one of the litigants in Pony Lake, and the Plaintiffs here are represented by the same counsel as the Pony Lake plaintiffs. See Tyus, 93 F.3d at 457 (noting that the presence of the same counsel suggested that the parties were closely related); VanDeWalle, 500 N.W.2d at 573 (noting that the sons and parents had a close relationship with respect to the property at issue in holding that the judgment in the parents' prior suit barred the sons' later suit); see also Trevino v. Gates, 99 F.3d 911, 923-24 (9th Cir. 1996) (applying virtual representation to a daughter's excessive force claim related to the death of her father where the decedent's mother (the plaintiff's grandmother) had already brought a wrongful death claim, based in part on the identical interests in seeing the officers punished and on the employment of the same attorney), cert. denied, 520 U.S. 1117

-16-

(1997). While these factors are not dispositive nor sufficient alone to establish privity, they do tend to tip the scale toward a finding of privity.

The Supreme Court has noted the importance of notice before a nonparty is precluded by a prior suit. Richards, 517 U.S. at 805. The Plaintiffs do not assert that they were unaware of the Pony Lake litigation, and the inclusion of at least one of the Plaintiffs' spouses as well as employment of the same counsel in this suit, filed less than one month after the Supreme Court of the United States denied the Pony Lake plaintiffs' petition for a writ of certiorari, satisfy us that the Plaintiffs were on sufficient notice of the prior suit that their due process rights would not be unduly hindered by application of res judicata to this suit. Nor do the Plaintiffs assert that the Pony Lake plaintiffs failed to vigorously pursue the voting rights claim or that they otherwise ineffectively presented the claim. Cf. Taylor v. Blakey, 490 F.3d 965, 974-75 (D.C. Cir. 2007) (considering the use of the same counsel as at least relevant to the issue of whether the nonparty was adequately represented in the prior suit as "strongly suggest[ing] satisfaction with the attorney's performance in the prior case"), cert. granted, 128 S. Ct. 977 (2008). The Plaintiffs argue only that they should have their own day in court. Based on the factors discussed above, we believe that the Nebraska courts would find these Plaintiffs to be in privity with the Pony Lake plaintiffs. The district court properly applied res judicata to preclude the Plaintiffs' right-to-vote claim.

III.

The appeal of the due process claims is dismissed for lack of standing. The district court's judgment on the right-to-vote claim is affirmed. The State Committee's Motion to Strike Portions of Appellants' Reply Brief and Argument in Support Thereof is denied.

_____